United States ex-rel Myron Winkelman, et al. v. CVS Caremark Corporation, et al. Good morning, your honors. Brian Wadalevich on behalf of the Relators Appellants, Winkelman and Martinson. With me this morning, too, Richard Salisbury from the state of Texas on the amicus. Wanted to let you know that he's available for answering questions if the court pleases. I would like to receive, hold at least two minutes in reserve for reply, please. Two minutes, yes. I would ask the court here on our case to be attentive to the recent Ninth Circuit case of Metesky v. Raytheon, where the court in the Ninth Circuit followed the Seventh Circuit lead in warning courts that they should stop throwing out so many citizen-relators by letting general allegations of wrongdoing be sufficient publicity. Is that court cited in your brief? Yes, it is, your honor. And it came out after our initial brief, so it's in the reply brief. As long as it's in the brief. Metesky has valuable similarities, too, for the court for us. There in Metesky v. Raytheon, it was publicized that there was massive overbilling by Raytheon. Also publicized that there were irregularities with the contract. The Ninth Circuit held that there was no explicit fraud in this prior publicity, but there could have been the transaction of fraud, the X plus Y formula. But the court concluded there was just not enough substantial similarities. And the key point is this. The prior publicity really didn't show deception, show misrepresentations by Raytheon. And that's what we have here in our case, in the prior publicity both in Connecticut and Washington, D.C. They talk about great overbilling. They talk about the Medicaid program, the new law, and discounts. But there's no allegation in the publicity of misrepresentations. Now this court in Poteet and Ondas also approach this public disclosure analysis sometimes by saying, are the essential elements of fraud publicized in the prior publicity? And again under that analysis, what's an essential element of a false claims act? A lie, a deception, a misrepresentation. But if all the facts are out in the public domain that show the deceptive conduct or the deception, as you put it, the mere fact that no one has used a word like fraud to describe them doesn't have consequential legal effect, does it? No, that's true. You can look at the X plus Y analysis. So what we have here is let's take the disclosures in Connecticut where the Connecticut attorney general has disclosed, as I understand the record generated in that case, has disclosed precisely what CVS was doing and has gone on to show or at least to allege how that was costing Connecticut substantial sums, particularly with reference to its Medicaid program. He didn't use, the attorney general didn't use the word fraud, but he described the same conduct that you've described in this suit. Well, yes, they did not use fraud, did not use the term deception. But likewise, they didn't really show that CVS was misrepresenting anything. They were showing that they weren't getting the discount prices and this new law in Connecticut was going to insist they get them. But there was not even the inference, as far as I could see, of that there was misrepresentations by CVS. And that's supposed to be an essential element in the fraud. Now, even if CVS could convince you that the misrepresentations were there, that the publicity in Connecticut showed that they were lying about the true UNC prices, the relators here still are original sources anyway. There are more than 12 points, areas where they added material evidence. Each is genuinely valuable. Each did not feed off the prior publicity in Connecticut. Each is independent of the prior publicity. And they're not at all re-pastinations or parroting of the publicity. Number one, Myron Winkleman is a contract Medicaid auditor. And this relator showed that in 2006, two years before they start this HSP discount program, CVS, in response to competition with Walmart that's come out with this $4 for 30 pills, Myron Winkleman sees that CVS is giving discount prices to the public, but not giving it as a UNC to the state Medicades. And he sees this. And he knows the UNC laws. This is before the 2008 HSP program. So he's got good material point showing intent of CVS. Before they even start the club, they're not giving the UNC prices. Point number two, after CVS launches the club, Winkleman looks at it closely and sees, aha, they're not giving these HSP prices to the UNC in Michigan. And then he digs further and he sees multiple other states they're not doing it. So he's showing and seeing a nationwide scheme, not just something that's brewing in Connecticut or somewhere. Number three, Winkleman produces evidence because he's a Medicaid fraud contractor that Medicaid agencies are not equipped to detect. They're unaware of overbilling related to UNC fraud. This is from his experience. And then he produces a letter, too, from the Illinois Medicaid acknowledging this. Number four, Stephanie Martinson, our other relator, she's working right at the CVS counter in Minneapolis. And she sees in 2008, two years before the Connecticut publicity, that at the retail level, they're not giving the UNC prices to Medicaid and to Medicare Part D, both. As required by law, she, like Winkleman, knows this is part of law. What does she materially add? That it's happening at the retail level, an insider. This, likewise, is not shown in the publicity from Connecticut. Point five, Martinson, working at the counter with the CVS computer, sees that the computer is set up so that the pharmacists like her and the technicians are completely unaware that the UNC prices, the HSP prices, are not being given to the government programs. And, in fact, if someone like her, who really knows the law and is attentive to it, an honest person, they're powerless to change that. CVS has set up the computer program to both hide it from the pharmacists and to prevent them if they consciously think about it, like Ms. Martinson did. This, likewise, is a material element of intent. Number six, Relator Martinson makes investigative work. She does phone calls to confirm with the Medicaid agency in Minnesota and the Medicare Part D contractors that, yes, they're not getting those UNC prices. This is actual, true investigative work. Again, revealing things not in the Connecticut publicity. Number seven, she goes and gets a good sampling of Medicaid and Medicare claims, brings them to the government. These are actual claim billings. You know, the defense and FCA cases are always willing and ready to jump on Relators for not having actual claim billings. Rule 9B particularity, throw them out of court. Well, here, when we bring them, what do they say? Oh, these are meaningless. These aren't material at all. Well, they shouldn't have it both ways. She's a good whistleblower who went and got actual claim billings. Number eight, Relator Martinson presents evidence that this club is, in fact, a sham, that there's no employee training. She's right there in the store. She sees and knows this. There's no system for filing enrollment forms. There's no system to log the fees. And particularly crucial, there's no hard stop on the computer, like they have other programs, so that if a customer has lapsed or hasn't paid their fee for this club, they're not immediately prevented. They can go ahead with the transaction. So she sees this in other programs. Again, this shows intent that this club is a sham. Number nine material point. Just after the launch in 2008 of this program, Martinson confronts one of the managers and says, Hey, are we giving these HSP discounts to Medicaid and Medicare? The manager says, No, no, because this is a club and there's a membership fee. We don't have to. So what does this show? It shows it's not a mistake. This is the actual plan of the management. They're well aware of it. Point number ten. Martinson again materially adds something important. She brings the marketing pitch that CVS uses to entice the public. They're asking the entire public, Please come and join our club. So this idea that it's a separate club is bogus. It's nothing other than the general public in the club. That's who gets invited. Plus, the same sales pitch on the website makes it clear to the public that the enrollment fee is meaningless. You're going to get that back, Mr. Customer or Ms., by some of your first purchase of the drugs, on top of our other discounts in the store. So their own publications show that it's a meaningless fee. So what does this materially add? That the club equals the general public or at least a segment of the general public, and the fee is meaningless. Point number 11. Recall the Connecticut publicity where CVS starts to stop the HSP program but then decides to obey the new law in 2010 where Connecticut gets explicit about, Hey, you have to give us these discounts. Okay, then they back down. So the whole impression there in the publicity is CVS is law-abiding. But point number 11, our relators bring direct evidence contradicting that. CVS is committing the UNC fraud in multiple states outside of Connecticut and after 2010, after that publicized controversy. Material evidence of the fraud scheme. Point number 12, the last one. Materially add, they show the relators Medicare Part D laws, Medicare Part D contracts, Medicare Part D claim samples, and Medicare Part D facts. All showing Medicare Part D UNC fraud as well. Nowhere is that publicized in Washington or Connecticut. So these are 12 material independent areas of fact. Now, let me go to the knowledge issue. CVS would have you ignore that knowledge can be pledged generally. That's Rule 9B. Now, they claim, because we don't have evidence of the subjective mind of some CVS executives, that we should be thrown out of court. Well, this is directly contrary to this court's holding in Carvelas in 2004, which says, look, state them. Do I correctly apprehend that you've now switched to CVS's alternative defense? Yes, I'm sorry. Yes. All right. So you've now left a public disclosure, an original source, and you've gone to failure to state a claim. Exactly. I'm going to the knowledge issue on failure to state a claim. I'm sorry. Well, and not only under 9B can we plead knowledge generally, but remember, this is not summary judgment stage, okay? We have an incomplete record. There's been no discovery at all, and we're confident there's a lot more evidence we can put forth on intent and knowledge when we have a chance to. But the court's Carvelas case says that, look, as the state of mind, which they're bringing up, you know, that's not something you can readily do at the initial pleading level. So we're not going to demand specificity there. Yet we, in fact, do bring specifics. Specific area number one for knowledge is the laws itself. You know, the Medicaid and Medicare regulations here, we cite, talk about general public or a segment of the general public or Massachusetts says any party, any person getting this price, we should be getting it in Medicaid. On top of that, they bring other evidence of intent I've already talked about, the club being a sham, et cetera. Thank you.  May it please the court, I'm Grant Geierman from Williams & Connolly with my colleague Craig Singer on behalf of the Appalese. The district court correctly held that there was extensive publicity that CVS was depriving the government of its health savings pass program price the year prior to the relators filing this lawsuit. Could you begin, since that's where the relator's attorney has spent the bulk of the argument? Absolutely. The original source exception to the public disclosure bar applies if the relators have knowledge that is independent of the public disclosures and materially adds to the information in the public disclosures. As an initial matter, many of the items that the relator's counsel ticked off during his argument are not allegations that are contained in the complaint. Instead, they are allegations that are contained in two affidavits that were submitted in opposition to CVS's motion to dismiss. And the district court held that the public disclosure bar after the 2010 amendments is no longer jurisdictional in nature. And if it's no longer jurisdictional in nature, those affidavits should not be considered as part of the record. That's not to say that the public disclosures themselves may not be considered as all the courts of appeals that have applied the amended version of the statute have permitted courts to consider the public disclosures on a motion to dismiss. The district court here took judicial notice of them, twice acknowledging its ability to take judicial notice. And the propriety of those disclosures in the record here is not a point of contention. So setting aside the fact that several of the allegations are not even part of the relator's complaint here, many of the allegations are not actually a material addition to the information that was already in the public sphere. First of all, several times counsel indicated that whether it was Relator Martinson or Relator Winkleman, knew or verified that the usual and customary price that CVS was submitting to the various government programs was not its health savings past price. That's the very fact that is the message of the Change to Win publication, as well as its ensuing publicity, as well as the Connecticut press release and the ensuing media articles about that. As to the first item that counsel indicated, that there was misconduct before 2006, that is not the theory that is pled in the complaint here. The complaint here says that starting in 2008, CVS started falsely reporting usual and customary prices because it was not reporting its health savings past price to the government. So conduct pre-2006 is not anything that's consistent with the theory of fraud that is being alleged in the complaint. Counsel indicated that Relator Winkleman has identified that this pricing practice occurred in Michigan and several other states. That's not a material addition to the public disclosures here, because the Change to Win study in the first instance indicated that CVS was charging a price above the health savings past price to the federal government and all employees in the Federal Employee Health Benefit Program, regardless of where they were throughout the country. There's nothing in the public disclosures here that would cause any inference to suggest that CVS's policy of treating its health savings past differently than its usual and customary price sort of was constrained by state lines. So the disclosures here are national in nature. There's nothing to suggest they're regional in nature, and therefore the fact that he may say he has personal knowledge that CVS was not reporting its HSP price in more than one state is not a material addition under this court's jurisprudence. Counsel indicated that none of the disclosures identified the Medicare Part D statute. In our appellee brief, we cited two cases coming out of the Seventh Circuit, which indicate that identifying the specific federal statute that is involved in a relator's complaint is not a prerequisite to a disclosure qualifying as a public disclosure. Here, the Connecticut publicity obviously squarely discussed the Medicaid program, and even though the Change to Win study was about the Federal Employee Health Benefit Program and not about the Medicare Part D statute, the point is that the disclosures here identified specifically the health savings past program. It identified specifically that CVS was not reporting the health savings past program price to government programs. Third, it was critical of CVS for not doing that, to the point of saying that CVS was performing a ripoff of American taxpayers and federal employees in that government program. Some of the Connecticut publicity even used inflammatory language that we were robbing consumers of valuable discounts. So the allegations were sufficiently inflammatory to satisfy what this court has looked to before, whether it be in the Ondas case or the Poteet case, for allegations that give a rise to an inference of fraud. Now, as to the argument that one of the relators has alleged that this program was a sham, she says that the relator asserts that there was no training, that the paperwork within CVS Pharmacy was handled differently for this However, that distinction simply reinforces the inference that CVS didn't believe that this was a program that was under the strictures of Medicaid regulations. And further to that point, when the relator identifies, again, in an affidavit that's not part of her complaint, when she identifies a conversation that she had with a supervisor and said, is the health savings pass price going to be treated as the usual and customary price, the supervisor said, no, it's a different program. It's not a program that's offered to our general public. People have to complete an application. They have to pay an initial and an annual enrollment fee. And they have to agree to the terms and conditions, including some types of waivers to receive marketing materials, et cetera. And those types of things make the club different. HSP pricing is not pricing that anyone can demand by walking in off the street. They have to affirmatively opt into the program and assume the obligations of membership. Counsel indicated that the enrollment fee was a meaningless fee. It's undisputed that the relator's own complaint identifies that there was an annual enrollment fee. There's no allegation in the complaint that the enrollment fee was waived, that the enrollment fee was refunded. The allegation in the complaint is that the enrollment fee was easily made up by the discounts that an enrollee in the health savings pass program would receive by purchasing prescriptions over a period of time. And obviously consumers that decided to enter the program believed that it was worth it to pay the enrollment fee for the discounts that they would receive on the prescriptions over time. But there's no suggestion in the complaint's allegations that the enrollment fee was a token term that was not enforced. Indeed, the printout setting forth the details of the HSP program that are clear that CVS would not allow a person to stay as a part of the program if they failed to pay the annual enrollment fee and that if a person failed to pay that fee that CVS could terminate them from the program. I think with respect to the public disclosure bar, I just want to make two critical points because I think that is where this court can and should affirm the district court, although we've raised alternative grounds. The allegations that were in the public disclosures were substantially the same as the relator's complaint here because they involved the health savings pass program, they identified that the health savings pass program price was lower than the price that was being charged to government health care programs, and third, they're critical of CVS for not passing that lower price on to government health care. I think that is sufficient under this court's test articulated in 2010 in the Poteet case as ultimately targeting the same fraudulent scheme. And the relators also are not original sources because under the way this court in Duxbury in 2009 articulated what it is to qualify as an original source, the court said it was looking for different information that was of great significance. And none of the items that the relator's counsel ticked off during his argument are different information of great significance to the very simplistic fraud that has been asserted by the relator. Their fraud is simply you had a program that had a price, $999 for a 90-day supply, and you didn't pass that price on to the government. It's as simple as that. With respect to our alternative arguments, I will rest on our papers. Again, unless the court has further questions on the public disclosure bar or otherwise, I will rest the rest of my time. Is there any need as far as your argument goes, is there any need for us to decide the point that the district court did decide, that is whether or not the public disclosure bar is jurisdictional? I believe that the outcome is the same whether you decide it's jurisdictional or not. So I think you don't need to decide whether it's jurisdictional. So the only difference that jurisdictional makes that I can see in this case is that if the public disclosure bar were jurisdictional, then the plaintiff's additional affidavits would be properly considered. I think that's right, and we believe that there's nothing, there are no details that are in the relator's affidavits that are a material addition to the otherwise public disclosed information. In other words, again, their fraud here is simply you had a price that you were charging to government health care programs, therefore, because you didn't pass that price on to the government programs, you overcharged it or defrauded it. None of the sort of tangential details that are offered in the affidavit add any substance or relevance to that core simplistic fraud that is identified in the affidavit. Well, Your Honors, even after hearing that, I failed to hear where those misrepresentations were in the prior publicity. They do say they overcharged, no question about that. But overcharging or gouging is not fraud. I also want to address the knowledge issue, the special club, not being part of the general public. We cited the cases of Garby and Doe from Illinois, and those opinions and those well-reasoned opinions aptly destroy this flim-flam that this club, these members, are not really part of the general public. Now, CVS provides you no analysis of a single one of the Medicaid regulations or the Medicare Part D regulation as to where the ambiguity is in those, because it's not there. They can't. Now they cite you. Counsel, excuse me, but there's a case in the Supreme Court from this circuit that has to do with what is actionable fraud and can it be found from a series of regulations, in that case governing nursing homes and noncompliance with those regulations. You keep harping on there was no misrepresentation, but that doesn't answer the question of how far the fraud statutes go. And so I've been wondering whether you're aware of the Supreme Court case and whether we should wait to see what the court is going to say in that case about how far the fraud guidelines go. I'm sorry. I guess I can't answer that question. Okay. If the Chief Judge doesn't mind, could you each, within a week, just send us a letter on this topic. Keep it short. Don't make a bunch of arguments. It really is. Does that case potentially affect the outcome of this case? Okay. And which case was that? Okay. Judge Stahl of this circuit wrote it. Okay. So put in First Circuit. Okay. You could put in Howard and Selye, too, since we were on it, but I'll be darned if I remember the name. All right. We remember issues more than we remember names. All right.  Thank you, Your Honors. Thank you.